UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JACOB ARQUILLA AND BONNIE ARQUILLA, et al., | ) ) ) | CASE NO. 5:13CV01847 |
| | ) | JUDGE JOHN R. ADAMS |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **ORDER AND DECISION** |
| | ) ) | (Resolving Doc. 69) |
| AULTCARE INSURANCE COMPANY, et al., | ) ) ) | |
| Defendants. | ) | |

This matter is before the Court on a motion for summary judgment filed by Defendants, Willbros Construction (U.S.), LLC, incorrectly identified as Willbros Construction, LLC and Willbros Group, Inc. (hereinafter collectively referred to as "Willbros"). (Doc. 69, 69-1) The Court finds that no genuine disputes of material fact exist as to Plaintiffs' claims of negligence and/or *respondeat superior* and negligent hiring, retention, and supervision of Willbros' employee, Defendant Juan Lugo. As such, for the following reasons, Willbros is entitled to judgment as a matter of law, and its motion for summary judgment is GRANTED.

I.     FACTS AND PROCEDURAL HISTORY

The case arises out of a motor vehicle accident. The parties do not dispute the underlying facts, which are as follows:

Willbros is in the business of installing underground pipelines nationwide. (Doc. 69-1) In January of 2013, Willbros was installing natural gas pipelines near Carrollton, Ohio (sometimes referred to as "the Utica job") for the Chesapeake Bay company. The project spread across 35 miles, with nearly 500 employees and tradesmen. (Doc. 69-2: Gist at 20; Doc. 69-4: Gooley at 18, 24-26)

1

Approximately 20-30 welders were hired, along with their welder helpers, from across the country.  A welder foreman would often hire the same welders, and the crews traveled to the various job sites nationwide, with each job lasting two weeks to four months.   (Doc. 69-2: Gist 13-14; Doc. 69-5: Lugo at 17-18)  Once the job was completed, a welder would be laid off but could apply and be re-hired for another project.  (Doc. 69-2: Gist 13)   Willbros completed background checks on all employees, including driving records, and would perform drug screenings for each welder. (Doc. 69-2: Gist at 73; Doc. 69-5: Lugo at 32-33)

Defendant Juan Lugo ("Lugo") was from Texas and had worked for Willbros in the past. He was re-hired for the Utica job by his foreman, Mark Gist.  (Doc. 69-2: Gist at 13-14)  Each morning, Lugo and the other welders were required to sign-in at the "warehouse" or "yard," which was a designated location near the center of the project.   (Doc. 69-2: Gist at 49; Doc. 69-5: Lugo at 126-27)   After the welders arrived and signed in at the warehouse, then a foreman or straw boss instructed them where to go on the project to work that particular day (referred to as "the jobsite").  (Doc. 69-2: Gist at 10-11)

Welders were paid an hourly wage, plus overtime.   Willbros provided all welding consumables such as grinding wheels, buffing wheels, welding rods, and fuel for the welding machines.   (Doc. 69-2: Gist at 26, 46-47; Doc. 69-5: Lugo at 27-28)   However, welders were responsible to bring their own welding machines, leads (or cables), stingers to hold the welding rods, a welding hood and protective clothing. (Doc. 69-2: Gist at 47; Doc. 69-5: Lugo at 25-28) Depending on the job, the welders sometimes housed their welding machines on their personal trucks.  However, on the Utica job, the terrain was so dangerous, that the welders' equipment was placed on a "morooka buggy" (sometimes "Morooka") and left on the buggy at the end of

2

each work day. As such, the welders did not have to use their personal trucks. (Doc. 69-2: Gist at 36-37, 42-43, 46-47; Doc. 69-5: Lugo at 49, 62-63)

Because the welders used their own welding equipment, the welders were also paid an additional $15 per hour, called "rig pay." Rig pay compensates the welders for the use of their welding machines and truck, if the truck is needed to transport the welding equipment on a particular jobsite. (Doc. 69-2: Gist at 31-33; Doc. 69-5: Lugo at 38, 42) The welders signed a "Pick Up Rental and Insurance Agreement" with Willbros, which stated: "The rental paid by Willbros Construction, for the use of Employee's pickup [truck] begins at the warehouse and ends at the work site/right of way and such rental will only apply for working time on the job." (Doc. 69-6; Doc. 69-2: Gist at 37-38) At the Utica job, the terrain was difficult and space limited, so the welders were transported from the warehouse to the jobsite by trucks and vans supplied by Willbros and driven by the foreman. (Doc. 69-4:Gooley at 27-28, 30-31)

In the early morning hours of February 20, 2013. (Doc. 1-1) Lugo was driving to work in his personal truck, accompanied by his welding helper/roommate. (Doc. 69-5: Lugo at 67) The rural road was dark with no overhead lighting and was covered with snow. (Doc. 69-5: Lugo at 84-90) Lugo lost control of the vehicle, and it slid into oncoming traffic, causing a collision with Plaintiffs, Jacob Arquilla, Jr. and Jacob Arquilla III. Plaintiffs suffered injuries, and along with their spouses and children, filed a lawsuit in the Stark County, Ohio, court of common pleas against Willbros, Lugo, Plaintiffs' medical insurance provider, Aultcare Insurance Company.

Aultcare then removed the case to federal jurisdiction, and Plaintiffs later amended the complaint to add their respective underinsurance carriers, Erie Insurance Company and Progressive Specialty Insurance Company, as parties to this action. Willbros filed the underlying

motion for summary judgment on all claims against it, including Plaintiffs' claims for negligence and/or *respondeat superior* and negligent hiring, retention, and supervision of Lugo.

## II. LEGAL STANDARD

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is material if it is one that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary burdens. *Id.* at 252. Further, on summary judgment, the inferences to be drawn from underlying facts must be viewed "in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The pivotal question in deciding a motion for summary judgment is whether a reasonable fact finder *could* make a finding in favor of either party. *See Anderson* 477 U.S. at 250 ("The inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.").

The initial burden of showing the absence of any "genuine issue" belongs to the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be resolved by a jury" or other fact-finder at trial. *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). A party opposing summary judgment must show that there are facts genuinely in dispute, and must do so by citing to the record. Fed.R.Civ.P. 56(c)(1)(a).

### III. LEGAL ANALYSIS

#### A. Negligence / *Respondeat Superior*

##### 1. "Going and Coming" Rule

It is well-established in Ohio that "an employer is not liable for the actions of its employee if the employee is not acting within the scope of his employment at the time when, and at the place where, the alleged conduct occurred." *Banks v. United States*, Nos. 1:06CV1630, 2007WL2114653 *3 (N.D. Ohio July 16, 2007) (*citing Kinsey v. Kinsey,* 98 F.Supp2d 834, 835-36 (N.D. Ohio 2000)). "A determination of whether an employee is acting within the scope of employment is a question of law, not fact, made in accordance with the law of the state where the conduct occurred." *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1143 (6th Cir. 1996). "[A]n employee who has a fixed and limited place of employment is as a matter of law not in the course of his employment when traveling to and from his work at that place." *Banks,* 2007WL2114653 at *4 (*citing Boch v. New York Life Ins. Co.,* 175 Ohio St. 458, 196 N.E.2d 90, 94 (Ohio 1964); *see also Morris v. Gavan*, 2009WL1921116 at *6 (N.D. Ohio July 1, 2009) (*citing Patidar v. Tri-State renovations, Inc.,* 2006WL2575726 at *3 (10th Dist. Ohio Aug. 31, 2006)). This is referred to as the "going and coming" rule.

Here, Plaintiffs do not dispute that, on the morning of the accident, Lugo was driving to a fixed place of employment. (Doc. 72; *see also* Doc. 69-5: Lugo at 82-85, 125-127[1]) Therefore,

---

[1]
    Q:    So the warehouse was in Mechanicstown.
    A:    Yes.
    Q:    And the job site was where you're welding the pipe?
    A:    Yes.
    Q:    And those were two different locations.
    A:    Yes.
    * * *
    Q:    Okay. So I want to make sure I understand. Every day when you'd go to work, did you go directly to the warehouse?
    A:    Yes.
    Q:    Okay. And, at the warehouse, you would – you'd sign in.

this case centers on whether Lugo was providing a "special benefit" to Willbros, other than making his services available at the worksite. *Id.*

### 2. "Special Benefit Exception"

The Ohio Supreme Court has held "…as a matter of law, a master is not liable for the negligence of his servant while the latter is driving to work at a fixed place of employment, where such driving involves no special benefit to the master other than the making of the servant's services available to the master at the place where they are needed." *Boch*, 196 N.E.2d at 94. The court reasoned that "…an employer is usually not concerned with the means of transportation used or the route taken by his employee in getting to work…In other words, until the employee gets to work he is usually not subject to the direction or control of his employer as to any details of any transportation enterprise that may be involved in getting him there." *Id.* at 93. "If the conduct of an employee is actuated by a purpose to serve his master, the conduct may fall within the employee's scope of employment." *Osborne v. Lyles*, 63 Ohio St.3d 326, 587 N.E.2d 825, 829 (2004).

The burden is on Plaintiffs to adduce evidence to show that Lugo was acting within the scope of his employment for the purpose of serving Willbros. *Wrinkle v. Cotton,* 9th Dist. No. 09CA008401, 2004-Ohio-4335 (*citing Senn v. Lackner*, 157 Ohio St. 206, 105 N.E.2d 49 (Ohio 1952)). Plaintiffs argue that Lugo was conveying a special benefit to Willbros on the morning of the accident because: 1) Lugo was receiving rig pay and therefore was required to make his truck available; 2) the rig pay agreement gave Willbros control over Lugo's method of transportation;

---

A: Yes.
\* \* \*
Q: And you did that the entire time you were on what we've been calling the Utica job in Ohio.
A: Yes.
Q: And then from the warehouse, did you go to the jobsite?
A: We did.

(Doc. 69-5: Lugo at 125-127.)

6

and 3) Lugo was carrying one of Willbros' acetylene tanks in the back of his truck at the time of the accident.

### a. Rig Pay

Plaintiffs first argue that Willbros received a special benefit from Lugo's commute on the morning of the accident because Lugo was receiving rig pay and, therefore, was required to bring his truck to the jobsite and make it available for Willbros' use. (Doc. 72 at 12) Plaintiffs point to no facts in the record that support this inference. To the contrary, the facts presented in the case establish that this conclusion is in error.

Both Lugo and his foreman, Mark Gist, testified that each welder is paid $15 per hour for the use of their welding equipment and their truck, when needed. (Doc. 69-2: Gist at 31-33; Doc. 69-5: Lugo at 38, 42) The rig pay was not divided into specific amounts for use of welder's equipment, transportation costs, wear and tear on their vehicles, etc. It was instead a lump sum amount that was part of the job's compensation package.

All parties acknowledge that there were certain types of terrain that made it difficult for a personal vehicle to traverse. Once the equipment was placed on the Morooka, the welders no longer needed their personal trucks for their equipment, and the welders were free to arrive at the warehouse in whatever manner they chose. Under these circumstances, Willbros still paid rig pay, although the welders may not have used their vehicles on the jobsite. For example, Mr. Gist testified:

> Q: Was Mr. Lugo expected to have his truck at the site every day?
>
> A: Not in this particular case, no, 'cuz I – I don't care how they got there. I mean, some guys drove their Jeeps. Some guys drove their cars. It didn't matter once I had 'em on a morooka buggy.

7

> Q: If he did not bring his truck to the jobsite, would he get paid his rig pay?
>
> A: Yes.

(Doc. 69-2: Gist at 35)  Mr. Lugo confirmed:

> Q: On those days where you just left your truck there and used the Morooka to transport yourself and your equipment, they still paid you that $15 a day.
>
> A: Yes, sir.

(Doc. 69-5: Lugo at 81)

Plaintiffs argue: "Although Willbros switched to using the morookas [sic] after two days due to the terrain and weather, Lugo believed he was responsible for bringing the truck to the jobsite on a daily basis in the event the weather and/or terrain changed." (Doc. 72 at 12)  This argument has no citation to the record and is inconsistent with all the testimony in this case. Fed.R.Civ.P. 56(c)(1).  Furthermore, the argument ignores other testimony from Lugo and Willbros indicating that, once all the equipment was on the Morooka, Willbros provided company vans and trucks to transport welders from the warehouse to the jobsite.

> Q: From the yard, where would they – how would they get to the site?
>
> A: Depending on what their position was, a lot of them would go out in crew trucks.  Others would go out in vans.
>
> On this particular job, we did not have a lot of right-of-way space, so everybody was encouraged to take our company transportation out there.
>
> Q: What is company transportation?
>
> A: The crew trucks, the vans.
>
> \* \* \*

Q: Were these provided by Willbros?

A: Yes.

Q: Who drove them?

A: Usually the labor foreman.

Q: Were these crew trucks kept at the yard site?

A: Yes.

\* \* \*

Q: Did employees take their own personal trucks out to the jobsite?

A: Again, not that I'm aware of because of the lack of room that we had on that particular job.

\* \* \*

Q: Did the welders take their own trucks out?

A: Most of them, I believe, if not all of them, took the vans out, and they also had a certain number of crew trucks available that was assigned to the welders, so they would ride out in those.

Q: And, again, my limited understanding of the situation, but my understanding is, is that welder trucks are slightly different than your normal pickup truck. Are you aware of that?

A: Yes, yes.

Q: Okay. If they have a specialized vehicle that they need to use, why wouldn't they take it out with them into the field?

A: Because, again, on this particular jobsite and on a lot of other ones, it's – the right-of-ways or the conditions are horrible out there, so they'll put their welding equipment on the Morooka buggies. I would assume you're familiar with the Morooka buggies by now?

(Doc. 69-4: Gooley Depo at 27-28, 30-31)

9

| | | |
|---|---|---|
| Q: | | What's a crew truck? |
| A: | | It's usually specifically what the straw boss will drive around for the laborers to get in, take 'em to the jobsite. |
| Q: | | And what is the straw boss? |
| A: | | It's an extension of the foreman. |

\* \* \*

| | | |
|---|---|---|
| Q: | | …Do the straw bosses drive the crew trucks? |
| A: | | Yes. |
| Q: | | Are they responsible for getting the employees from the yard to their specific sites that they're going to be working on that day. |
| A: | | Some employees, yes. |
| Q: | | How do the other employees get there? |
| A: | | Well, on this – on [sic] this instance here, I put all the welders in the bus, a van. As a matter of fact, they had three vans. Once they came to the yard in the morning, they loaded up in the van and we took 'em to work. |
| Q: | | And were these vans provided by Willbros? |
| A: | | Yes. |

(Doc. 80-1: Gist Depo. at 47-49)

Plaintiffs next argue: "[T]he rig pay agreement gave Willbros control over Lugo's method of transportation." (Doc. 72 at 12) Once again, Plaintiffs provide no factual support or citations to the record. Fed.R.Civ.P. 56(c)(1). Instead, the only other sentence in support of their argument about control over transportation is the speculative hypothetical: "If Willbros had in place a standing order requiring Lugo to bring the truck every day, or had specifically ordered

10

Lugo to bring the truck on the date of the accident, there is no question Lugo would have been required to bring the truck rather than ride with his welding assistant or another employee." (Doc. 72 at 12) This unsupported conclusion describes a hypothetical situation that did not occur in this case and is not only unsupported by the record but is exactly opposite of the actual events that took place on the day of the accident. There was no standing order to bring the truck, but rather, as described in detail above, Willbros specifically provided transportation from the warehouse to the jobsite, and Lugo was merely responsible for commuting to and from the warehouse each day. Therefore, Plaintiffs' second argument regarding rig pay is unsupported, speculative, and irrelevant, and certainly does not create a genuine issue of material fact.

On the day of the accident, it is undisputed that the welders had not used their trucks to transport their equipment for three weeks at the Utica jobsite. Instead, the welders were using the morooka buggy to store and transport their equipment. There is simply no evidence presented that the payment of rig pay to a welder was a mandate by Willbros that each welder had to make their personal vehicles available to the company at all times or that Willbros exercised some "control" over Lugo's commute in any way. To the contrary, Willbros provided the transportation to the welders once their equipment was on the Morooka, and the evidence demonstrates that the rig pay was paid to each welder, whether or not their personal vehicles were needed on the job. (Doc. 69-5: Lugo at 81) When the morooka buggies were used, individual vehicles were not needed on the jobsite, and Lugo's use of his vehicle then provided no benefit to Willbros apart from transporting Lugo to the warehouse in order to make his services available to the company.

11

No genuine dispute of material fact exists; and as a matter of law, Willbros is not liable for Lugo's alleged negligence in accordance with the Ohio Supreme Court's decision in *Boch, supra*.

b. Acetylene Tank

Finally, Plaintiffs argue that Willbros exercised some control over Lugo's commute because: 1) Lugo had inadvertently retained one of Willbros acetylene tanks on his truck from a previous part of the project; and 2) Willbros had protocols in its safety handbook regarding the transportation of acetylene. However, Plaintiffs point to no facts that support any inference to these arguments. Instead, the evidence demonstrates that Willbros had policies and procedures that employees were required to follow while transporting certain chemicals <u>at the jobsite and during work hours</u>. This is established by the very citations to the record presented by the Plaintiffs themselves. Specifically, Plaintiffs cite to Mr. Gooley's testimony, which reads:

> Q: Okay. The next page we're going to look at is page 808 through 809, which is the Bates-stamped pages. And this section is entitled Operation of Automotive Equipment. And it appears to be page – beginning on page 30 of the handbook. You can see that number in the corner. Can you take a look at those pages for me, sir?
>
> A: (Complying.) Okay.
>
> Q: And what type of vehicles does this section pertain to?
>
> A: **That would be any vehicle within company time during the scope of their work.**

(Doc. 79-1: Gooley at 56-57 (emphasis added)) Mr. Gist likewise stated:

> Q: I understand that. I'm asking you a hypothetical question. If you saw Mr. Lugo drive into the yard prior to the start of work with that acetylene tank rolling around in the back of his bed, you have an obligation to advise him that that is not safe, correct?

12

> [Objections omitted.]
>
> A: I just – you know, there'd be no other place for it to be on his truck 'cuz the machine sets here, and that specific hole is for that specific bottle [of acetylene]. This bracket right here is for the oxygen bottle.
>
> Q: And if this oxygen bottle or acetylene bottle were not stacked and attached to –
>
> A: There are policies and procedures that are written right here for – let's say, for instance, if the crew or somebody in a crew truck is **transporting some of these bottles on the jobsite during work hours** to get the stuff to – this is a personal vehicle, and once it's on, it's stowed.
>
> If he had a bottle rolling around on his truck, I'd say, "Hey" – yeah – "Juan, you might tighten that up some."

(Doc. 80-1: Gist Depo at 101 (emphasis added).)

Not only do the facts establish that Willbros had protocols over equipment and chemicals transported on the jobsite, during work hours, but Plaintiffs point to no evidence that Willbros exerted any control over an employee's commute to and from work. Moreover, Lugo testified that he had unintentionally left Willbros' acetylene tank on his truck and that he did not need the tank for any part of the job on the morning of the accident.

> Q: What was that tank doing in the back of your truck that day?
>
> A: I just never did take it out.
>
> Q: Is that a tank that you were using for your welding operations at this jobsite?
>
> A: No, sir.
>
> Q: No? How do you know that?
>
> A: Because I wasn't – everything was on the morooka.

13

> Q: Would you have had any reason to transport that tank?
>
> A: I just – when my – when I first got there, we started off from the trucks for two days, and I had loaded all that up for that particular job, but we unloaded the trucks and never did unload that.
>
> \* \* \*
>
> Q: Again, that tank you were not planning on using for your work that day.
>
> A: No.
>
> Q: In fact, you hadn't used it for at least three weeks before the accident, right?
>
> A: Correct.
>
> Q: And there was already a tank on the morooka that you were planning on using for your welding.
>
> A: Yes, ma' am.
>
> \* \* \*
>
> Q: Do you believe you were working in the course and scope of your employment the day when the accident occurred?
>
> [Objections omitted.]
>
> A: No, ma'am.
>
> \* \* \*
>
> Q: When you were traveling to the warehouse that morning, was there anything you were doing for Willbros at that time before that accident?
>
> A: No, ma'am.

(Doc. 69-5: Lugo Depo at 106, 144, 134, 143)

Lugo was not conferring a benefit to Willbros on the day of the accident when he inadvertently transported a tank of acetylene that the company was not using, while commuting

14

to work. Furthermore, Willbros was not controlling Lugo's commute or had otherwise reserved the right to control his commute by the mere presence of the tank on Lugo's truck.

No genuine dispute of material fact exists as to Plaintiffs' claim of negligence / *respondeat superior*, and a jury could only conclude that Willbros is not liable for Lugo's conduct on the day of the accident. As such, Willbros is entitled to judgment as a matter of law on Plaintiffs' claims.

### B. Negligent Hire, Retention, and/or Supervision

Willbros filed its motion for summary judgment on Plaintiffs' claims that the company negligently hired, retained, and/or supervised Lugo. (Doc. 69) Plaintiffs have made no argument opposing summary judgment on this claim. (Doc. 72) In Ohio, the elements for the claims of negligent hiring, negligent retention, and negligent supervision are the same: "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee was the proximate cause of the plaintiff's injuries." *Hout v. City of Mansfield,* 550 F.Supp.2d 701 (N.D. Ohio 2008) (*citing Linder v. Am. Nat'l Ins. Co.,* 155 Ohio App.3d 30, 798 N.E.2d 1190, 1197 (2003)). "[F]oreseeability is the test of employer liability." *Hout,* 550 F.Supp.2d at 745 (*citing Dawson v. Airtouch Cellular*, 42 F.Supp.2d 767, 772 (S. D. Ohio 1999)).

Here, Plaintiffs have not presented any evidence, let alone evidence creating a genuine issue of material fact, that Lugo's truck sliding in the snow on the way to work was foreseeable. There is no evidence that Willbros negligently hired, retained, or supervised Lugo. Instead, Willbros conducted background checks on all employees, Lugo submitted and passed drug

15

screenings, and he maintained a valid, unrestricted driver's license. (Doc. 69-2: Gist at 73-75; Doc. 69-5: Lugo at 31-36, 77-79)

Plaintiffs do not oppose summary judgment on the claim for negligent hiring, retention, and supervision, and the Court finds that no genuine issue of material fact exists on this claim. As such, Willbros is entitled to judgment as a matter of law.

## IV.  CONCLUSION

Reviewing the facts in a light most favorable to the Plaintiffs, no genuine dispute of material fact exists on any claim against Willbros. Thus, a jury could only reach one conclusion – that is, Willbros is not liable for the acts of its employee while commuting to work nor did it negligently hire, retain, or supervise its employee. Therefore, Willbros is entitled to judgment as a matter of law, and its motion for summary judgment is GRANTED.

IT IS SO ORDERED.


DATE: March 31, 2015  */s/ John R. Adams*_____
                                          Judge John R. Adams
                                          UNITED STATES DISTRICT COURT